(C.D. 4851)

G. M. Rubber Industries, Inc., plaintiff *v.* United States, defendant

Court No. 75-5-01099

(Decided March 31, 1980)

*Siegel, Mandell & Davidson* (*Herbert T. Posner* at the trial and on the briefs) for the plaintiff.

*Alice Daniel*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation (*Sidney N. Weiss* at the trial and on the brief), for the defendant.

Maletz, Judge: This action involves the dutiable status of merchandise, described on the invoices as rubber overshoes, which was imported from Brazil by plaintiff and entered at the port of San Juan, Puerto

Rico during the period March 1973–January 1974. The merchandise was classified by Customs under item 700.52 of the Tariff Schedules of the United States (TSUS) as footwear of rubber or plastics, and assessed duty at the rate of 25 percent ad valorem. Plaintiff challenges this classification and claims the importations are properly classifiable under item 774.60 as other articles not specially provided for, of rubber or plastics, dutiable at the rate of 8.5 percent ad valorem.

The pertinent provisions of TSUS read as follows:

*Classified under:*

Schedule 7, part 1, subpart A

Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

Hunting boots, galoshes, rainwear, and other footwear designed to be worn over, or in lieu of, other footwear as a protection against water, oil, grease, or chemicals or cold or inclement weather, all the foregoing having soles and uppers of which over 90 percent of the exterior surface is rubber or plastics (except footwear with uppers of nonmolded construction formed by sewing the parts thereof together and having exposed on the outer surface a substantial portion of functional stitching):

\*      \*      \*      \*      \*      \*      \*

700.52             Footwear (except footwear provided for in item 700.51), the uppers of which do not extend above the ankle, designed for use without closures, whether or not supported or lined_____ 25% ad val.

*Claimed under:*

Schedule 7, part 12, subpart D

Articles not specially provided for, of rubber or plastics:

\*      \*      \*      \*      \*      \*      \*

774.60          Other_____ 8.5% ad val.

*General interpretative rules:*

10(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

Plaintiff claims that the imported merchandise is neither finished nor unfinished footwear. Rather, it contends that the importations are parts of footwear and therefore cannot be classified under item 700.52 since that item does not contain a "parts" provision. For that reason, plaintiff concludes that the imported merchandise is properly classifiable under item 774.60 as other articles not specially provided for, of rubber or plastics.

The record in the case includes the testimony of three witnesses for the plaintiff and two witnesses for the defendant.[1] The record discloses the following:

The importations—which as previously noted were invoiced as rubber overshoes—had two types of soles, i.e., a grooved sole and a smooth sole. After the articles were imported into Puerto Rico, plaintiff added an "ice gripper sole coating" to the soles which consisted of a rubber adhesive coating combined with an abrasive alumina grit. The product with the grit sole was known as the "Ice Gripper" and was specifically designed for use on slippery surfaces such as ice and snow.

Plaintiff never sold the imported overshoes without the addition of the grit to the soles. The reason, according to plaintiff's witnesses, was that in their condition as imported the overshoes were unsafe for use on wet or icy surfaces because of the smooth or grooved surface of their soles. Further, laboratory tests showed that on a wet concrete surface the imported overshoes had very little slip resistance or traction as compared to similar articles which had a raised tread pattern. Based on these tests, the person who conducted them testified that the imported overshoes were unsafe and dangerous to the wearer on ice and snow in that the shoes supplied very poor footing with consequent risk of injury. In that witness' view, it was analogous to using a car tire without tread. In addition, the witness estimated that with the grit sole added, the overshoe provided 100 percent greater traction than in its condition as imported. However, the witness agreed that in its condition as imported, the overshoe provided greater traction than a leather sole shoe.

Defendant's witnesses testified that in their opinion the imported merchandise has utility as a rubber overshoe because it provides protection from water and contaminants and is therefore marketable in the United States. More specifically, these witnesses stated that the imported overshoes are marketable for use in animal husbandry and atomic energy plants. In this connection, they indicated that farmers

---

[1] The witnesses for plaintiff were: (1) Jack Rubin who was secretary-treasurer of plaintiff from 1968–77; (2) Felix Konstandt, the president and technical director of National Testing Laboratories, Inc., a commercial testing laboratory engaged in the testing and evaluation of consumer products; and Alvin Chanon, former vice president and later president of plaintiff during 1968–77.

The witnesses for defendant were: (1) Frank M. LeCompte, vice president in charge of engineering at the Tingley Rubber Corp., a manufacturer of rubber footwear; and (2) William McCollum, executive vice president in charge of marketing, advertising, and sales at the Tingley corporation.

who are engaged in animal husbandry, where it is important not to track contaminants from one bin to another, use overshoes of the type imported by plaintiff as a protection against such contaminants. Further, defendant's witnesses stated that rubber boots with treadless soles are used on contamination areas of atomic energy plants to protect the wearer from radiation dust and pointed out that some 19 years ago, their company had produced such a treadless rubber boot. They conceded, however, that at present no company produces an overshoe without a tread but indicated that their company has a standing offer from a major company in the industry to produce that type of boot for use in atomic energy facilities. The witnesses agreed that tread design on a rubber overshoe can greatly enhance its slip resistance. Finally, they stated that their company had never manufactured nor sold an article of merchandise with a sole identical to the soles found on the imported merchandise.

With respect to the cost of the grit, a witness for plaintiff testified that the imported merchandise cost plaintiff 80 cents per pair. He stated that the labor cost in Puerto Rico for adding the grit sole was $1.50 per pair and that the cost of the adhesive and grit was about 55 cents per pair. On the other hand, a witness for the defendant expressed the opinion that the grit sole could be applied for approximately 25 percent of the cost of the overshoe.

In this setting, it must be concluded that the merchandise at issue is of a class or kind designed to be worn as a protection from water or chemicals and thus is finished footwear. For the record is clear that rubber overshoes of the type involved here are of a class or kind which are designed to be worn, and in fact are worn, in animal husbandry and atomic energy plants to protect the wearer against these elements. This being the case, the imported merchandise falls within the provisions of item 700.52 which covers "footwear designed to be worn over, or in lieu of, other footwear as a protection against water, * * * or chemicals * * *."

In addition, it was plaintiff's burden to prove that the overshoes in question are not of a class or kind designed to be worn as a protection from these elements. And in this respect, the plaintiff has not rebutted the presumption of correctness that the appropriate Customs officer found every fact necessary to sustain classification under item 700.52. *United States* v. *New York Merchandise Co.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970). Thus, even accepting at face value the testimony of plaintiff's witnesses and plaintiff's argument that the overshoes are unsafe for use on ice or snow, this does not establish that they are of a class or kind unsuitable for use in animal husbandry and atomic energy installations for protection against water or chemicals. Indeed, the record is to the contrary. And it is

not dispositive that the soles of the imported overshoes are not identical to the soles used in animal husbandry and atomic energy plants.

What is more, even should it be assumed arguendo that the imported merchandise is not finished footwear, it still would be classifiable under item 700.52 as unfinished footwear. As previously indicated, general interpretative rule 10(h) provides that a tariff description for an article covers such an article whether it is finished or unfinished. And to constitute an unfinished article within the meaning of this rule, the article must be substantially complete. See, e.g., *Authentic Furniture Products, Inc.* v. *United States*, 61 CCPA 5, C.A.D. 1109, 486 F. 2d 1062 (1973); *Daisy-Heddon* v. *United States*, 66 CCPA 97, C.A.D. 1228, 600 F. 2d 799 (1979). In *Daisy-Heddon*, the court indicated that in determining whether an article is substantially complete the following factors can be relevant: (1) Comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article.

Considering the first of these factors, i.e., comparison of omitted and nonomitted parts, the merchandise in the present case can be and is used as protective footwear in animal husbandry and atomic installations. The addition of the grit sole makes the product suitable for use on ice or snow and hence merely changes its market use. Aside from this, there is considerable doubt whether this factor is even applicable here since the merchandise is imported in the form of a rubber overshoe and the addition of the grit sole would seem properly describable as further processing rather than the addition of a part.

With respect to the second factor, i.e., a comparison of the time and effort required to complete the article with the time and effort required to place it in an imported condition, no evidence was presented as to the time and effort required in the manufacturing process either in Brazil or Puerto Rico.

Turning now to the third factor, namely a comparison of the cost of the included parts with that of the omitted parts, it must be concluded that the evidence presented by the parties was insufficient to make an adequate comparison of the cost of the overshoes with the grit sole and the cost of the overshoes without the grit sole. It is true that a witness for plaintiff testified that the cost of the overshoes with the grit sole was $2.85 per pair, while the cost of the overshoes without the grit sole was 80 cents per pair. However, little probative weight can be given to this testimony since there is a total absence of any

132

documentary or other supporting data. Beyond that, a witness for defendant expressed the opinion that the grit sole could be applied for approximately 25 percent of the cost of the overshoe.

The fourth factor is the significance of the omitted parts to the over all functioning of the completed article. Here, as pointed out above, the addition of the grit sole merely changes the market use of the product.

With regard to the last factor as to whether the trade recognizes the importation as an unfinished article or as a part of that article, it is to be noted that the articles are invoiced as "rubber overshoes." Persuasive too is the testimony of the defendant's witnesses that the merchandise, as imported, is marketable as, and meets the requirements of, rubber overshoes.

In sum, considering the factors set out in *Daisy-Heddon*, the conclusion is that the merchandise as imported, if not finished footwear, is at the very least unfinished footwear.

For the foregoing reasons, the classification of the importations by Customs under item 700.52 is affirmed and the action is dismissed.